IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PLANNED PARENTHOD OF KANSAS AND
MID-MISSOURI, et al.,

      Plaintiffs,

      v.

SUSAN MOSIER, M.D., Secretary, Kansas
Department Of Health And Environment, In
Her Official Capacity,

      Defendant.

Case No. 16-2284-JAR-GLR

## MEMORANDUM AND ORDER

In May 2016, after an informal administrative hearing, Defendant Susan Mosier, in her official capacity as Secretary of the Kansas Department of Health and Environment ("KDHE"), at the direction of Governor Sam Brownback, terminated as Medicaid providers Plaintiffs Planned Parenthood of Kansas and Mid-Missouri ("PPKM"), Planned Parenthood of the St. Louis Region and Southwest Missouri ("PPSLR"), and eleven current and former individual provider Plaintiffs who are, or were in the past, employees of PPKM and PPSLR. The KDHE provided three grounds for the termination decisions: (1) video evidence about practices by other Planned Parenthood Federation of America ("PPFA") affiliates that include unlawful agreements to procure fetal tissue after abortions; (2) PPKM's failure to cooperate with KDHE solid waste disposal inspections; and (3) claims submission concerns about other PPFA affiliates identified by neighboring states. Plaintiffs PPKM, PPSLR, the individual providers, and three Jane Doe patient Plaintiffs filed this action challenging the KDHE's decision under the Medicaid Act and the Equal Protection Clause of the United States Constitution, and sought preliminary injunctive relief from the termination decisions. On June 13, 2016, the KDHE reconsidered and reversed

its decision to terminate the eleven individual health care provider plaintiffs from the Medicaid program.  On June 29, 2016, the individual providers voluntarily dismissed their claims in this matter.[1]

Before the Court are Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 12); Motion to Certify Class (Doc. 14), and Motion to Strike Exhibits (Doc. 51). These motions are fully briefed, and the Court heard argument on the preliminary injunction motion on June 7, 2016.  The Court considers the motion for preliminary injunction as it pertains to PPKM and PPSLR only.

On June 24, 2016, Defendant filed a Motion to Dismiss (Doc. 59), re-arguing some of the justiciability arguments raised in response to the motion for preliminary injunction, adding others, and challenging both of Plaintiffs' claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  This motion is not fully briefed, but the Court at this time considers Defendant's justiciability challenges, to the extent necessary to rule on the motion for preliminary injunction.

Having fully considered the parties' arguments and evidence on these issues, the Court is prepared to rule.  As described more fully below, Plaintiffs' motion for preliminary injunction is granted and the class certification motion is denied without prejudice.  The motion to strike is denied.  Defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction is denied in part; the motion otherwise will remain pending and the Court will rule on the remaining issues raised therein after it is fully briefed.

## I.    Background

Plaintiffs have submitted the sworn declarations of Laura McQuade, President and CEO of PPKM, and Mary Kogut, President and CEO of PPSLR in support of their motions for

---

[1]Doc. 61.

preliminary injunction.[2]  Each declarant is responsible for the management of their respective organization and is therefore familiar with operations and finances, including the services they provide and the communities they serve.  The Court finds that the information provided in these declarations is within the scope of each declarant's personal knowledge, given their roles in these organizations.

For forty years, PPKM (and its predecessor organizations) has been a Medicaid provider for thousands of Kansans.  PPKM provides Medicaid services to Kansas residents at two health centers in Kansas and three health centers in nearby cities in Missouri.  In 2014, PPKM and affiliated providers provided family planning services at approximately 750 visits to nearly 500 Medicaid patients.  In 2015, PPKM and affiliated providers provided services at over 650 visits to nearly 450 Medicaid patients.  PPKM offers a range of family planning and other health services, including annual exams, contraception (including long-acting reversible contraception or "LARC") and contraceptive counseling, hormonal counseling, screening for breast cancer, screening and treatment for cervical cancer, screening and treatment for sexually transmitted infections ("STIs"), including human papilloma virus ("HPV") vaccines, pregnancy testing and counseling, and other limited general health services, such as hemoglobin testing for anemia. The Wichita, Kansas City, and Independence health centers are in areas that have primary care provider shortages.

PPSLR operates several health centers in Missouri, including a health center in Joplin, Missouri, which is located approximately seven miles from the Kansas border and provides family planning health services to a small number of Kansas Medicaid patients each year, including well-woman exams, contraception (including LARC) and contraceptive counseling,

---

[2]Doc. 13-2, Ex. 1,  McQuade Decl.; Doc. 13-3, Ex. 2, Kogut Decl.; *see also* Doc. 49-2, Ex. 1, McQuade Supp. Decl.; Doc. 49-3, Ex. 2, Kogut Supp. Decl.

hormonal counseling, screening for breast cancer, screening and treatment for cervical cancer, screening and treatment for STIs, including HPV vaccines, and pregnancy testing and counseling.  PPSLR's Joplin, Missouri health center is located in a Primary Care Health Professional Shortage Area ("HPSA"), and Cherokee County, Kansas, the county directly across the border from Joplin, Missouri is also in a Primary Care HPSA and is designated as a Medically Underserved Population Area.

In 2013, the Kansas Medicaid program implemented KanCare and moved from a fee-for-service program model to a managed care program model.  PPKM enrolled as a KanCare provider at that time with three managed care organizations ("MCOs") that the State of Kansas contracted with to coordinate care for nearly all of its Medicaid beneficiaries.  Defendant has submitted a 2016 contractual amendment to its contracts with the MCOs, which provides that a contract termination with a Medicaid provider "shall be effective 30 calendar days after notification from the State that the provider's state fair hearing rights have expired or the state fair hearing has been completed related to the Medicaid termination."[3]  But PPKM has attested that its contracts with the various MCOs do not contain this provision, and instead allow for a quicker contract termination.[4]  PPSLR does not have contracts with the MCOs that coordinate care for most Medicaid patients in Kansas.

In order to qualify for Kansas Medicaid/KanCare, among other requirements, an adult must be low-income and either pregnant, disabled or a parent.  For example, the monthly income for a family of four cannot exceed $768.  Medicaid does not pay for abortions for Kansas women

---

[3]Doc. 37-11, Ex. 1-J at 10.

[4]Doc. 49-2, Ex. A ¶ 17, Ex. A-1.

except under very narrow circumstances allowed for under federal law: if their lives are in

danger or if they are a victim of rape or incest.[5]

According to evidence presented by both sides of this dispute, PPKM and PPSLR are

both independently incorporated affiliates of Planned Parenthood Federation of America.[6]  For

example, Defendant presents PPFA's Consolidated Financial Statements and Supplementary

Information from June 30, 2015 and 2014, as evidence that Planned Parenthood affiliates are

"financially integrated" with PPFA.  That document provides details about the organizational

structure of PPFA:

> PPFA, which is the nation's oldest and largest voluntary family planning
> organization, maintains primary domestic offices in New York City and
> Washington, DC . . . .  The Organization is also affiliated with 61 independent
> medical and related entities, and 104 ancillary entities (including 55 Political
> Action Committees and 55-501(c)(4) organizations), all of which are separately
> incorporated in their respective states and which collectively constitute PPFA's
> membership.  Accordingly, the accompanying consolidated financial statements
> do not include the financial position or the changes in net assets and cash flows of
> these independent affiliated organizations.[7]

With respect to financial support from PPFA, the document explains:

> The National Program Support Plan (NPS) is a membership program between
> PPFA and Planned Parenthood Affiliates.  NPS requires affiliates to pay quarterly
> membership dues to PPFA for the support and national visibility PPFA provides
> as well as the right to use the PPFA brand.  The revenue is recognized as an
> increase to unrestricted net assets as the membership fees become due.[8]

---

[5]This funding restriction is commonly referred to as the "Hyde Amendment."  *See, e.g.*, *Harris v. McRae*, 448 U.S. 297 (1980); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2013) ("actually, a rider that Congress attaches to each year's appropriations legislation"), *cert. denied*, 134 S. Ct. 1283 (2014).

[6]Doc. 13-2, Ex. 1,  McQuade Decl. ¶ 26; Doc. 13-3, Ex. 2, Kogut Decl. ¶ 9; Doc. 37-8, Def. Ex. 1-G, Planned Parenthood 2014–2015 Annual Report ("PPFA supports 59 independently incorporated affiliates that operate 661 health centers across the U.S.").

[7]Doc. 37-9, Def. Ex. 1-H at 9.

[8]*Id.* at 13.

Another fund, the Fund for the Future ("the Fund"), is a PPFA fund designed to help "long-term development of the Organization's affiliates.  The Fund receives board-designated resources as well as affiliate and general-public contributions.  The Fund's investment returns are used for development grants to affiliates."[9]  As stated repeatedly throughout the record, PPKM and PPSLR are not subsidiaries of PPFA; they are separate corporations. PPKM and PPSLR are members of PPFA, which promulgates medical and other standards to which  affiliates must adhere in order to operate under the name "Planned Parenthood" and otherwise use the Planned Parenthood mark.[10]  PPFA does not provide medical services or operate health centers.  PPFA exerted no control or ownership interest in PPKM or PPSLR in providing them with grants or other funding.

Plaintiff Jane Doe #1 is a PPKM patient who lives in Overland Park, Kansas and has received her annual well-woman gynecological exam at the Overland Park health center.  She qualifies for Medicaid until the spring of 2017.  Jane Doe #1 characterizes her care as excellent based on the friendliness of the staff, and the fact that she does not feel judged because she is a single mother.  She states that the providers she saw at PPKM spent as much time as necessary explaining to her the care she was getting and talked with her about her concerns.  PPKM was the only provider that would schedule an appointment for her annual exam, getting her in for an appointment very quickly.  She wants to continue to receive her reproductive health care from PPKM and is not sure where she would get her care if it is not an option.

Plaintiff Jane Doe #2 is a long-time Planned Parenthood patient who has most recently received care at PPKM's Overland Park health center.  She has received a range of health care services including annual examinations, birth control (Depo-Provera shots), screening for STIs,

---

[9]*Id.* at 23.

[10]Doc. 13-2, Ex. 1, McQuade Decl. ¶ 27; Doc. 13-2, Ex. 2, Kogut Decl. ¶ 10.

treatment for pre-cancerous cells, sexual health education, and breast cancer screenings.  Jane

Doe #2 is currently disabled and relies on Medicaid for her health insurance.  She prefers going

to Planned Parenthood because she believes they have an expertise in reproductive health care

that is unmatched by other providers, and she feels comfortable asking Planned Parenthood about

anything related to her reproductive health care.  She wishes to continue to obtain her

reproductive health care from Planned Parenthood and does not wish to find another provider.

 Plaintiff Jane Doe #3 is a PPKM patient who lives in Wichita, Kansas.  She is a KanCare

recipient and has no other health insurance.  At the PPKM health center in Wichita, she receives

her annual examinations, follow up care after some abnormal pap smears, birth control, and STI

screening and treatment.  At a Planned Parenthood clinic in another state, she also received an

abortion.  Most recently, the PPKM health center in Wichita provided her with a pregnancy

confirmation test.  She is currently 33 weeks pregnant.  After she has the baby, Jane Doe #3

plans to return to the Wichita health center for birth control.  Given her status as an established

patient at PPKM, it is important to her to be able to return there for her reproductive health care.

She believes that Planned Parenthood "saved my life in many ways by providing me the health

care that I needed at critical points in my life."[11]

 In July 2015, a group called the Center for Medical Progress ("CMP") released a series of

YouTube videos purporting to depict representatives  from PPFA and from Planned Parenthood

affiliates in other states discussing the illegal sale of fetal tissue and altering abortion procedures

to preserve fetal tissue.  The videos themselves are not part of this record.  Instead, Defendant

submits unauthenticated transcripts from two videos dated July 25, 2014,[12] and February 6,

---

[11]Doc. 7-2, Ex. A, Decl. of Jane Doe #3 ¶ 6.

[12]Doc. 37-2, Ex. 1-A.

2015.[13]  The 2014 transcript identifies the speakers as "Two actors posing as Fetal Tissue Procurement Company," and Deborah Nucatola, MD, Senior Director of Medical Services, PPFA.  The 2015 transcript identifies the speakers as Mary Gatter, MD, President, Medical Directors' Council, PPFA and Medical Director, Planned Parenthood Pasadena & San Gabriel Valley, Laurel Felczer, WHCNP, Senior Director of Medical Services, Planned Parenthood Pasadena & Sun Gabriel Valley, and "Two actors posing as Fetal Tissue Procurement Company."  The parties vehemently dispute whether the transcripts are complete and reliable.[14]  But it is undisputed that neither video transcript mentions PPKM, PPSLR, or any of their current or former employees.  It is also undisputed that PPKM and PPSLR do not participate in fetal tissue donation or sale.

Kansas investigated PPKM about whether it failed to comply with Kansas law regarding fetal organs and tissue. "After careful review of the investigative materials," the Disciplinary Panel of the Kansas Board of Healing Arts ("KBHA") concluded on January 7, 2016, that no further action should be taken against PPKM.[15]  Also, the Missouri Attorney General investigated PPSLR and determined that there was no evidence of wrongdoing.

A few weeks before the KBHA concluded its investigation, KDHE's Bureau of Waste Management ("BWM") inspectors appeared unannounced at the PPKM Overland Park health

---

[13]Doc. 37-3, Ex. 1-B.

[14]Plaintiffs move to strike the transcripts of these videos, attached to Defendant's response as Exhibits 1-A and 1-B.  The motion is denied.  The Rules of Evidence do not apply at the preliminary injunction stage of this proceeding.  *See, e.g.*, *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).  Moreover, the Court finds that the authenticity and reliability of this evidence is not at issue at this time, given the Court's finding *infra* that because there is no dispute that the videos do not depict PPKM or PPSLR or their employees, and because Plaintiffs are likely to succeed in showing that these affiliates are separate and distinct from PPFA and its other affiliates, attributing the conduct portrayed in these videos to these Plaintiffs was not a proper basis to exclude them as Medicaid providers under the Medicaid Act.

[15]Doc. 13-2, Ex. 1-A at 27.

care center on December 16, 2015, for a solid waste inspection pursuant to K.A.R. § 28-29-16.

That regulation provides that a duly authorized representative of Secretary Mosier

> at any reasonable hour of the day, having identified themselves and giving notice
> of their purpose, may:
>> (1) Enter a factory, plant, construction site, solid waste disposal area, solid
>> waste processing facility, or any environment where solid wastes are
>> generated, stored, handled, processed, or disposed, and inspect the
>> premises and gather information of existing  conditions and procedures;
>> (2) Obtain samples of solid waste from any person or from the property of
>> any person, including samples from any vehicle in which solid wastes
>> are being transported;
>> (3) Drill test wells on the affected property of any person holding a permit
>> or liable for a  permit under K.S.A. 65-3407 or amendments of that statute
>> and obtain samples from the wells;
>> (4) Conduct tests, analyses, and evaluations of solid waste to determine
>> whether the requirements of these regulations are otherwise applicable
>> to, or violated by, the situation observed during the inspection;
>> (5) Obtain samples of any containers or labels; and
>> (6) Inspect and copy any records, reports, information, or test results
>> relating to wastes generated, stored, transported, processed, or disposed.

BWM had never previously inspected the PPKM Overland Park health care facility.  The

BWM inspectors were escorted to two exam rooms, but when they reached the laboratory about

one hour into the inspection, PPKM staff informed them that they had spoken to PPKM's

attorney and that although the inspectors could continue, they could not take further photographs

out of concern for clinic and patient privacy and safety.  At this point during the inspection,

patients were present at the facility.  The BWM inspectors also asked PPKM staff for a list of its

vendors, including linen service and regular trash hauler vendors.  PPKM was concerned about

whether this information would become unprotected public information, exposing the vendors to

anti-abortion harassment that has occurred in other states were such information was made

public.  PPKM staff asked the inspectors about whether the requested vendor information would

remain confidential and the inspectors responded that it would be available through the Kansas

Open Records Act and PPKM would have to go through the official process of claiming the

information as confidential.  PPKM would not provide the inspectors the names of the facility's solid waste vendors, and asked the inspectors to return with a signed warrant.  They returned later that day with a signed warrant.  PPKM's legal counsel told the inspectors that they could inspect, but could not take photographs due to concern for patient and staff safety.  Again, counsel declined to provide the list of solid waste vendors, and the BWM inspectors left.

On January 5, 2016, BWM inspectors returned again with a warrant, and stated that they would only photograph relevant areas and take measures to protect patient privacy.  PPKM eventually provided vendor information to the BWM on January 15, 2016, after agreeing to allow PPKM additional time to provide the vendor information and to document PPKM's request to keep any photographs confidential.  After the inspection, the facility was provided with a report that stated no violations had been identified.[16]

One week later, Governor Sam Brownback announced during his State of the State address on January 12, 2016:

> In 2011, I signed legislation stopping most taxpayer funding from going to Planned Parenthood.  The time has come to finish the job.
> Planned Parenthood's trafficking of baby body parts is antithetical to our belief in human dignity.
> Today, I am directing Secretary Susan Mosier to ensure that not a single dollar of taxpayer money goes to Planned Parenthood through our Medicaid program.  I welcome legislation that would enshrine this directive in state law.[17]

Almost two months later, on March 10, 2016, the KDHE sent the Plaintiff providers a Notice of Intent to Terminate Provider, "[a]t the direction of Governor Sam Brownback as set forth in his letter to Secretary Susan Mosier, M.D.," attached to each notice.  The notices state that KDHE intends to terminate the provider's participation in the Kansas Medical Assistance

---

[16]Doc. 13-4, Ex. 3 ¶ 20; Ex. 3-E.

[17]Governor Sam Brownback, 2016 State of the State (Jan. 12, 2016) (transcript available at http://governor.ks.gov/media-room/speeches/2016/01/13/2016-state-of-the-state---january-12-2016).

Program ("KMAP") under K.A.R. 30-5-60(a), subsections (2) noncompliance with applicable state laws, administrative regulations, or program issuances concerning medical providers; (3) noncompliance with the terms of a provider agreement; (9) unethical or unprofessional conduct; and (17) other good cause.  In an attachment to the letters of intent to terminate, KDHE provided three grounds for termination: (1) video evidence about practices by Planned Parenthood Federation of America affiliates that include unlawful agreements to procure fetal tissue after abortions; (2) failure to cooperate with solid waste disposal inspections; and (3) claims submission concerns identified by neighboring states about other PPFA affiliates.

The notice of intent to terminate letters provided for an administrative review on March 23, 2016.  But an informal administrative review with legal counsel for PPKM and PPSLR was held on April 29, 2016.  PPKM and PPSLR counsel presented evidence to rebut the allegations in the notice of termination letters and requested that if the KDHE decided to follow through with the termination, that it be made effective thirty days from the issuance of the decision.

On May 3, 2016, the provider Plaintiffs received final notices of termination, with an effective date of May 10, 2016.  The notices state that "[a]fter thorough review of all information presented, it is the decision of DHCF that your participation in KMAP will be terminated effective May 10, 2016."[18]  The final notices provided no further information about the grounds for termination. The final notices advised the providers of their right to request a hearing under K.A.R. § 30-7-64, et seq. within 33 days of the notice.

The day after receiving the final termination notices, Plaintiffs filed this lawsuit and sought a temporary restraining order ("TRO") before the May 10 termination date, and a preliminary injunction pending a final decision on the merits. The Complaint alleges the

---

[18]*See, e.g.*, Doc. 1, Ex. A at 2 (notice to PPKM).

following claims for relief under 42 U.S.C. § 1983: (1) violation of the Medicaid Act, 42 U.S.C.

§ 1396a(a)(23) "free-choice-of-provider" provision; and (2) an Equal Protection violation under

the Fourteenth Amendment.

The Court set a TRO hearing for May 6.  But soon after setting the hearing, the parties

jointly agreed to proceed on the request for preliminary injunction only and requested a

continuance of the hearing until May 17.  On May 10, the parties again jointly requested a

continuance of the hearing until May 25.  On May 17, outside counsel for the KDHE withdrew

from the case and the Court conducted a status conference by telephone.  Upon assurance from

the KDHE that its termination decision would not become effective until July 7, 2016, the Court

again reset the briefing deadlines on the motion for preliminary injunction and continued the

hearing until June 7.  On June 13, 2016, the KDHE reversed its termination decisions as to the

individual provider Plaintiffs; these Plaintiffs have voluntarily dismissed their claims.  The Court

therefore considers the motion for preliminary injunction motion as it applies to the PPKM and

PPSLR termination decisions only.[19]

## II.    Administrative Review and Justiciability

Under the KDHE regulations promulgated in furtherance of the Kansas Administrative

Procedure Act ("KAPA"), the providers have the right to request a fair hearing administered by a

hearing officer from the KDHE's administrative hearings section to review an unfavorable

decision.[20]  The hearing may be by telephone unless a party shows good cause why a fair and

---

[19]On July 5, 2016, Defendant submitted a letter to the Court notifying it that it received a notice of name change from PPKM and Comprehensive Health of PPKM to Planned Parenthood Great Plains, effective July 1, 2016.  Doc. 62.  The letter states that this may render PPKM's claims moot, and argues that the fraudulent billing practices basis for the termination decision "is now directly at issue."  The letter further states that the "merger may have significant regulatory implications, such as requiring PPGP to obtain a new Medicaid provider identification number and provider agreement."  *Id.* at 1.

[20]K.A.R. § 30-7-67.

impartial hearing could not be conducted by telephone.[21]  Either party can then request a rehearing before a state appeals committee.[22]  Once the administrative process concludes, a party may further appeal through the state courts under the Kansas Judicial Review Act.[23]  Defendant argues that because Plaintiffs have the right to request this fair hearing within 33 days of the effective date of the KDHE's termination decisions, or by August 10, 2016,[24] the administrative process has not yet been exhausted, and therefore Plaintiffs lack standing and the case is not ripe for review.  Alternatively, Defendant argues that this Court should abstain in deference to the KDHE's administrative proceeding.  Plaintiffs attest through declarations that they do not intend to file an administrative appeal.  They further argue that the Court must rule before the effective date of the decisions in order to provide them with meaningful relief, and that abstention is not warranted.

Article III of the Constitution gives federal courts the power to exercise jurisdiction only over "Cases" and "Controversies."  As the Supreme Court has explained, "[i]n limiting the judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law."[25]  A court lacking jurisdiction must dismiss the case, regardless of the stage of the proceeding, when it becomes apparent that jurisdiction is lacking.[26]  The party who seeks to invoke federal jurisdiction bears

---

[21]K.A.R. § 30-7-72.

[22]K.A.R. §§ 30-7-77, -78.

[23]K.S.A. §§ 77-604 through -631.

[24]K.A.R. § 30-7-68(a).

[25]*Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).

[26]*Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995).

the burden of establishing that such jurisdiction is proper.[27]  "Thus, plaintiff bears the burden of showing why the case should not be dismissed."[28]  Mere conclusory allegations of jurisdiction are not enough.[29]

        As described more fully below, the Court rejects Defendant's ripeness, standing, and abstention challenges to this Court's jurisdiction.[30]  In so doing, the Court is mindful that Defendant's position on the effective date of termination has been a moving target so far in this short-lived litigation.  First, the KDHE declined Plaintiffs' request after an April administrative hearing to delay any termination decision for thirty days from the date that the final termination letters were issued, and instead set an original termination date of May 10 (one week from the date of the final termination letters).  This prompted Plaintiffs to immediately file suit and request a temporary restraining order, which the Court set for hearing on May 6  in order to render a decision before the May 10 effective date.  The parties then jointly requested two continuances of the hearing until May 17 and then May 25, which were both tied to the KDHE's agreement to extend the effective date of the termination decisions.  Then, during a May 17 status conference, outside defense counsel advised that they would be withdrawing, and agency counsel Mr. Dernovish advised that he would be entering an appearance.  Mr. Dernovish sought a thirty-day extension of all deadlines, including the effective date of the termination, which he pledged to extend to July 7. At this status conference, the Court proposed that the parties enter

---

[27] *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002).

[28] *Harms v. IRS*, 146 F. Supp. 2d 1128, 1130 (D. Kan. 2001).

[29] *United States ex rel. Hafter, D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999).

[30] Defendant has suggested a potential mootness challenge in a footnote to its response brief, at oral argument, and in a July 5, 2016 letter to the Court, based on the merger between PPKM and Planned Parenthood of Central Oklahoma.   The Court does not consider this issue to be in a posture for disposition at this time.  As Defendant admits in its July 5 letter, it is unclear whether the merger means merely a name change to PPKM, or whether it would require an entirely new Medicaid provider contract.  Until this development is resolved, the Court will not find that this case is moot based on this development.  Instead, the Court evaluates the record as it exists today by evaluating whether the KDHE's termination decision as to the named Plaintiffs must be enjoined.

into an agreed injunction until September that would freeze the status quo, conduct expedited discovery over the summer, and set this case for a trial on the merits in late-September. Plaintiffs were amenable to this schedule but the KDHE was not, stating that while it did not oppose a fall trial date, it objected to any injunction being entered in the interim.  This Court therefore set deadlines tied to a July 7 termination date; the preliminary injunction hearing was continued to June 7 to allow the Court time to render a decision before the terminations were set to go into effect.

When it filed its response to the motion for preliminary injunction on May 31, Defendant argued for the first time that the preliminary injunction motion is premature because the provider terminations could not possibly take effect until September 10, 2016, at the earliest.[31]  Defendant takes the position that this case is not ripe, that the Court should abstain under *Younger*, that Plaintiffs lack standing, and that there is no irreparable harm based on the repeated contention that no provider termination will actually occur until the provider Plaintiffs' administrative appeal time runs on August 10, 2016, and then thirty more days pass—a period provided under the State's contracts with the various MCOs that administer the Kansas Medicaid program. Defendant attached no statement from the agency attesting to the fact that it would stay its decision until that time period passed.

The Court expressed frustration at the June 7 hearing about the procedural posture of this case.  Newly-retained defense counsel, who entered their appearances after the response brief

---

[31]*See, e.g.*, Doc. 37 at 15 ("The termination of Medicaid funding thus will not occur before September 10, 2016, perhaps months later if Plaintiffs simply file an appeal."), 20 ("Planned Parenthood will not lose a dime of Medicaid funding until after their appeals are exhausted."), 37 ("Planned Parenthood and the Individual Provider Plaintiffs will not lose any Kansas Medicaid funding while state administrative appeals are pending.  The Individual Plaintiffs will have their services at Planned Parenthood reimbursed under the same standards, through the same mechanism (the MCOs), as before KDHE initiated this administrative process, while any appeals are pending.  No harm of any kind will befall any Plaintiffs until at least September 10, 2016 . . . ."), 38 ("Any modification of funding is at least three and one-half months away, perhaps more.").

was filed and four days before the hearing, took the odd position that entering into a stipulated injunction would somehow require a concession on the merits of the case.  The Court understood at the conclusion of oral argument that these issues were ripe for adjudication, and made clear that it intended to rule on Plaintiffs' request for relief before the July 7 effective date.  The Court was therefore surprised to learn of Defendant's lengthy motion to dismiss filed on Friday, June 24, 2016, reasserting several justiciability arguments, adding others, and seeking to dismiss the substantive claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  Once again, many of the KDHE's arguments are tied to its contention that no enforcement action can take place before September 10, 2016.[32]

Defendant's motion to dismiss does nothing to allay the Court's concern that Defendant wishes to have its cake and eat it too.  The Court cannot fathom why Defendant objects to some form of agreed injunctive relief during the period between the KDHE's July 7 termination date, and the date upon which Defendant claims reimbursements would be declined under the MCO contracts unless it intends to enforce the terminations.  Defendant repeatedly asserts in its briefs that no action may be taken before this September date, but never addresses Plaintiffs' argument that there is nothing in the law or record that would guarantee a stay of the termination decisions while the appeal time runs, and pending any appeal that may be taken.  Plaintiffs further point out that the contractual extension does not apply to PPSLR, and that their contracts with the MCOs do not reflect that January amendment in the contracts between the State and the MCOs. In the Court's view, absent some sort of stipulation or other assurance, Plaintiffs reasonably do not take counsel's briefing statements at their word that the termination decisions will not become effective until September.  This refusal to commit to the KDHE's intended course of

---

[32]Doc. 60 at 1, 2, 22, 23.

action has created a procedural headache for the parties and for the Court, especially given the newly-filed motion to dismiss that deserves responsive briefing before decision. As Defendant is no doubt fully aware, it is impossible at this juncture for the Court to allow full briefing, and decide the motion to dismiss in its entirety before July 7. The fact that Defendant is unwilling to put its counsel's representations into a stipulated order that would apply to both providers is entirely inconsistent with its position that this dispute is premature.

### A.      Ripeness

Defendant urges this Court to deny the motion for preliminary injunction without prejudice based on "prudential considerations" associated with the timing of the motion. Although buried in the response brief and not articulated as such at oral argument, Defendant clarifies in the motion to dismiss that this is a ripeness challenge based on the fact that the effective date of the Medicaid terminations is potentially two months away.

Ripeness is a jurisdictional prerequisite to suit that has both constitutional and prudential components.[33] "Ripeness doctrine prevents courts from 'entangling themselves in abstract disagreements' and interfering in agency policy until 'an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"[34] When considering whether a claim is ripe for adjudication, the Court must consider a two-part test evaluating the "fitness of the issue for judicial resolution and . . . the hardship to the parties of withholding judicial consideration."[35]

### 1.      Fitness for Judicial Resolution

---

[33]*See, e.g.*, *United States v. Bennett*, –F.3d–, 2016 WL 3034664, at *7 (10th Cir. May 26, 2016).

[34]*Farrell-Cooper Min. Co. v. U.S. Dep't of Interior*, 728 F.3d 1229, 1234 (10th Cir. 2013) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)).

[35]*U.S. West Inc. v. Tristani*, 182 F.3d 1202, 1208 (10th Cir. 1999) (citing *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d a1495, 1499 (10th Cir. 1995)).

To determine the fitness for judicial resolution prong, the Court asks "whether judicial intervention would inappropriately interfere with further administrative action and whether the courts would benefit from further factual development of the issues presented."[36]  Plaintiffs took advantage of their optional right to an administrative hearing, where Plaintiffs' counsel was informally allowed to present evidence to rebut the allegations in the notices of intent to terminate.  After hearing this evidence, Defendant proceeded to issue final termination decisions. An agency's action will be ripe for review where "the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."[37]  Here, the "final" termination notices represent concrete actions by the KDHE that threatened to harm Plaintiffs by excluding PPKM and PPSLR as Medicaid providers, notwithstanding the option of an administrative appeal.[38]  Unlike the cases cited by Defendant, this case does not call upon the Court to consider contingent future events.[39]

Defendant argues that judicial intervention would interfere with an ongoing administrative proceeding, and that the KDHE's decision "is without imminent practical effect" because it cannot take effect until the time to administratively appeal passes, plus an additional thirty days provided under the State's contracts with the MCOs.  Although the termination letters advise the providers of their right to a fair hearing, they do not state that the decisions will be

---

[36] *Farrell-Cooper*, 728 F.3d at 1235 (quoting *Sierra Club v. Dep't of Energy*, 287 F.3d 1256, 1262–63 (10th Cir. 2002)).

[37] *Nat'l Park Hospitality Ass'n v. U.S. Dep't of Interior*, 538 U.S. 803, 807–08 (2003).

[38] *See Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967) (finding challenged regulation final where it is "definitive," not merely the "ruling of a subordinate official," nor "tentative.").

[39] *See, e.g.*, *Park Lake Res. LLC v. U.S. Dep't of Agric.*, 197 F.3d 448, 451–52 (10th Cir. 1999) (finding claim not ripe because applicable regulations required agency to revise determination during implementation, so claim rested upon contingent events); *Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1094 (10th Cir. 2004) (finding decision not concrete where outcome was dependent upon voter approval of part of the project, a purely hypothetical outcome).

stayed pending review, nor that these are tentative or advisory decisions.  If Plaintiffs do not

appeal, they can be assured that on August 10, 2016, the KDHE's decision will stand.  And even

if they do request a fair hearing, under K.A.R. § 30-4-66, assistance is not terminated *unless* it

concerns "the termination of a provider from program participation."  While it is true that the

MCO contract submitted by Defendant states that a provider termination is effective thirty

calendar days "after notification from the State that the provider's state fair hearing rights have

expired or the state fair hearing has been completed related to Medicaid termination,"[40] this

provision changes nothing about the termination decision itself.  Further, it is not clear that the

contractual provision relied upon by Defendant applies to PPSLR, nor that it applies to the

contracts between the MCOs and PPKM.[41]  There are no contracts in the record between those

parties except for the contract between PPKM and one KanCare MCO, Amerigroup Kansas,

Inc.[42]  That contract provides for immediate termination. There is no foundational evidence in

the record providing this Court with a basis to conclude that the amendment submitted by

Defendant caused the MCO's to supersede their agreements with PPKM.  And PPSLR does not

contract with the KanCare MCOs,[43] so the KDHE decision will certainly be effective for PPSLR

on August 10, 2016.

When considering threatened action by the government for purposes of standing and

ripeness, the Supreme Court has explained that "where threatened action by *government* is

concerned, we do not require a plaintiff to expose himself to liability before bringing suit to

challenge the basis for the threat—for example, the constitutionality of a law threatened to be

---

[40]Doc. 37-11, Ex. 1-J at 10–11.

[41]Doc. 37-11, Ex. 1-J.

[42]Doc. 49-2, Ex. A-1.

[43]PPSLR maintains that it does not bill the MCOs or Kansas directly because it is billed as an "out of network" provider, which still requires a Medicaid provider agreement.

enforced."[44]  The Court finds that the KDHE's final termination decisions are sufficiently concrete and imminent to make the claims in this case ripe.

Defendant argues that the Court should allow the KDHE to exercise its agency expertise because the issues in this case are fact driven and deserve a more fully developed administrative record.  To be sure, the parties dispute the degree to which PPFA and the Planned Parenthood affiliates in this case are connected.  And there is some dispute about the details involving the solid waste inspection.  But both parties have submitted evidence on these issues and, tellingly, neither party requested an evidentiary hearing on the motion for preliminary injunction.  They treated the hearing as oral argument, resting on the evidence submitted with the briefs.  Defendant provides the Court with no explanation about how these non-legal issues demand "agency expertise" in order to resolve the claims in this case.  Certainly it does not take agency expertise to determine the relationship between affiliated organizations.  Instead, the Court finds that this case predominately involves purely legal questions: the meaning of 42 U.S.C. § 1396a(a)(23), and the applicability of the Equal Protection clause to the facts of this case.[45] While additional factual development is expected, given its procedural posture, "in the vast majority of cases in which ripeness is not found, 'additional factual development' is absolutely 'necessary,' a feature wholly absent from a proceeding focused on the outer parameters of a statute's meaning."[46]

## 2. Hardship

---

[44]*Medimmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128 & n.8 (2007); *see also Consumer Data Ind. Ass'n v. King*, 678 F.3d 898, 907 (10th Cir. 2012) (ripeness is seldom an obstacle to a pre-enforcement challenge in this posture, where the plaintiff faces a "credible threat" of enforcement").

[45]*Accord Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 627 (M.D. La. 2015).

[46]*Id.* at 629.

The Court also finds Plaintiffs have demonstrated hardship if this Court declines to review the decision—the KDHE's termination decisions result in a legal and practical harm by terminating the providers' status as Medicaid providers.[47]  Plaintiffs need not await the effective date of the decisions in order to suffer a legal hardship—there is no chance that the decisions will change before the effective date absent Plaintiffs' deciding to file an optional appeal.  And, as described, it is not clear under the regulations that the termination decision would be stayed even if the providers requested a fair hearing.

As discussed above, while September 10, 2016 may be the effective date for the MCOs to terminate the provider agreements based on the KDHE's summary decision, the KDHE's decision itself becomes final on August 10, 2016.  The Court finds that the claims in this case are fit for judicial resolution, and that Plaintiffs will suffer a hardship if this Court declines to review their § 1983 challenges to the KDHE's termination decisions.

### B.	Standing

In its recently filed motion to dismiss, Defendant argues for the first time that Plaintiffs lack standing under Article III of the Constitution to assert their claims in this case because the alleged injury is neither imminent nor fairly traceable to Defendant's actions.  One of several doctrines reflecting Article III's case-or-controversy limitation on the judicial power is the doctrine of standing.  That doctrine requires federal courts, before considering the merits of an action, to "'satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [the plaintiff's] invocation of federal-court jurisdiction.'"[48]

---

[47]*See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733–34 (1998) .

[48]*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

Standing is evaluated based on the facts as they exist at the time the complaint is filed.[49]  At the pleading stage, the Court "'presume[s] that general allegations embrace those specific facts that are necessary to support the claim,'"[50] and "general factual allegations of injury resulting from the defendant's conduct may suffice.'"[51]  Nonetheless, the Court is "not bound by conclusory allegations, unwarranted inferences, or legal conclusions."[52]

The Supreme Court has found the "irreducible constitutional minimum of standing" to contain three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result of the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."[53]

"An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur."[54]

For the same reasons explained under the Court's ripeness analysis,[55] the Court finds that Plaintiffs have suffered an injury in fact.  Defendant argues that the injury is not imminent because the effective date of the termination decisions is four months after the Complaint was

---

[49]*Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004).

[50]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

[51]*Id.*

[52]*Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994).

[53]*Lujan*, 504 U.S. at 560–61 (quotation marks and citations omitted).

[54]*Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 n.5 (2013)).

[55]The issues of imminence and ripeness really "boil down to the same question" in this case.  *Susan B. Anthony List*, 134 S. Ct. at 2341; *see also Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 630 (M.D. La. 2015).

filed.  But that is not the correct benchmark.  First, the original effective date of the termination decisions (known to Plaintiffs when they filed the Complaint) was May 10, 2016, a mere six days after the Complaint was filed.  The only reason the effective date was extended in the first place was by agreement of the parties, to allow Defendant time to respond to the motion for preliminary injunction and for the dispute to be fairly heard on a less expedited timeline.  The Court and the Plaintiffs were prepared to proceed with a hearing on this matter back on May 6.  Moreover, the availability of administrative review does not impede Plaintiffs' injury for standing purposes, particularly given Plaintiffs' assertion that they will not pursue an administrative appeal.  Given this, they have demonstrated that there is a "substantial risk" that the harm alleged in this case will occur.  The KDHE's final decision will stand absent a unilateral reversal by the agency of that decision, or an appeal by Plaintiffs, which they have foresworn.  And under the contract provision submitted by Defendant, the KanCare MCOs are required to terminate PPKM and PPSLR from the Medicaid program once this happens, even if the effective date of the action is delayed for thirty days.  Plaintiffs have met their burden to show that the injury is certainly impending and that there is a substantial risk that the harm will occur.

The Court also finds that the alleged injury is fairly traceable to Defendant's action.  Plaintiffs need not show that Defendant's conduct was the "proximate cause" of its injury in fact, but, "[i]f 'speculative inferences are necessary to connect [a plaintiff's] injury to the challenged action,' this burden has not been met. Moreover, where 'the independent action of some third party not before the court'—rather than that of the defendant—was the direct cause of the plaintiff's harm, causation may be lacking."[56]  Defendant argues that the termination action

---

[56]*Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008) (quoting *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976)).

cannot be fairly traceable to Defendant's action because it will be the result of Plaintiffs' decision not to pursue an administrative appeal.  There is no allegation, nor evidence that the alleged injury in fact—PPKM and PPSLR's termination as Kansas Medicaid providers and the denial of their Medicaid patients' right to choose them as a family planning provider—is due to the independent actions of a third party not involved in this lawsuit.  And as already discussed, any administrative appeal in this case is optional; administrative exhaustion is not required for Plaintiffs to pursue their § 1983 claims.[57]  Likewise, the Court will not impose an indirect exhaustion requirement by finding that Plaintiffs caused their own injury by failing to pursue administrative remedies.

### C.    *Younger* Abstention

The Court next considers Defendant's argument that it should abstain under the *Younger* abstention doctrine.  Under *Younger*, a federal court considers whether:

> "(1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state court provides an adequate forum to hear the claims raised in the federal complaint, and (3) the state proceedings involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies." Once these three conditions are met, *Younger* abstention is non-discretionary and, absent extraordinary circumstances, a district court is required to abstain.[58]

The issue in this case is whether the administrative appeal process available to Plaintiffs constitutes an ongoing administrative proceeding, which involves two inquiries: (1) whether there is an ongoing proceeding; and (2) "whether the proceeding is the *type* of state proceeding

---

[57]*Houghton ex rel. Houghton v. Reinerston*, 382 F.3d 1162, 1167 n.3 (10th Cir. 2004) (citing *Porter v. Nussle*, 534, U.S. 516, 523 (2002); *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 521–22 (1990)).

[58]*Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1215 (10th Cir. 2003) (quoting *Amanatullah v. Colo. Bd. of Med. Exam'rs*, 187 F.3d 1160, 1163 (10th Cir.1999)) (citations omitted).

that is due the deference accorded by *Younger* abstention."[59]   Plaintiffs argue that neither component of the initial prong of *Younger* is met here.

The Court agrees with Plaintiffs that the administrative proceeding here is not ongoing. If PPKM and PPSLR decide to appeal the KDHE's termination decisions, the fair hearing would be conducted under the KAPA.[60]   If the administrative decision was unfavorable to the provider Plaintiffs, they would be able to further appeal that decision in the state courts.  There can be no dispute that the trial and appellate stages of state court litigation are considered a unitary process for purposes of *Younger*.[61]   The Supreme Court has twice left open the question of whether "an administrative adjudication and the subsequent state court's review of it count as a 'unitary process' for *Younger* purposes."[62] Several other circuits have held that the administrative proceeding is part of that unitary process and therefore a litigant must exhaust judicial review of administrative decisions before filing suit in federal court.[63]   However, Defendant has pointed the Court to no authority that this unitary process is considered ongoing before it even begins. The cases considering this issue examine whether a pending or completed administrative proceeding is ongoing where the plaintiff files a federal claim instead of completing the administrative process and pursuing judicial review of the administrative decision.[64]  Here, the

---

[59]*Brown ex rel. Brown v. Day*, 555 F.3d 882, 888 (10th Cir. 2009).

[60]K.S.A. § 77-501 to -566.

[61]*Huffman v. Pursue, Ltd.*, 420 U.S. 592, 608 (1975).

[62]*Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 592 (2013); *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 369 (1989) ("*NOPSI*")).

[63]*See, e.g.*, *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 166 (4th Cir. 2008); *Maymo-Melendez v. Alvarez-Ramierez*, 364 F.3d 27, 35 (1st Cir. 2004); *Majors v. Engelbrecht*, 149 F.3d 709, 713 (7th Cir. 1998); *see also Brown*, 555 F.3d at 901 (Tymkovich, J., dissenting).

[64]*See Ohio Civil Rights Comm'n v. Dayton Christian Schs.*, 477 U.S. 619, 627 (1986) (considering federal case filed while administrative proceedings were pending that had been initiated by school board); *Alleghany Corp. v. McCartney*, 896 F.2d 1138, 1144 (8th Cir. 1990) (federal complaint filed instead of seeking state court judicial review); *O'Neill v. City of Philadelphia*, 32 F.3d 785, 790 (3d Cir. 1994) (failure to seek state court judicial review of administrative proceeding). *But see Moore v. City of Asheville*, 396 F.3d 385, 389 (4th Cir. 2005) (finding

only administrative decisions are summary decisions by the KDHE terminating benefits.  No administrative appeal has been filed and the Plaintiffs have made clear that they do not intend to file an administrative appeal.

Even if the administrative proceeding is ongoing, the Court finds that the administrative decision here is not the type that requires *Younger* abstention.  In 2013, the Supreme Court made clear that abstention is warranted in only three types of proceedings: (1) state criminal prosecutions; (2) certain civil enforcement proceedings; and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions."[65]  The administrative appeal in this case clearly does not meet the first or third category; the parties dispute whether the administrative appeal procedure available to the provider Plaintiffs constitutes a "civil enforcement proceeding."  In *Sprint Communications, Inc. v. Jacobs*, the Court explained that civil enforcement proceedings are generally "akin to a criminal prosecution in important respects," and "are characteristically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act."[66]  The Court cannot find that the KDHE's termination decision constitutes a "civil enforcement proceeding" under this guidance.  First, the KDHE's termination decision is not akin to a criminal prosecution.  A state agency is permitted under the law to initiate an enforcement action under K.S.A. § 77-624, but this was a summary termination decision by the KDHE.  While there was presumably an investigation before the termination decision was made, there was no proceeding that began with a complaint or formal charge against the providers.  The providers chose to avail themselves of an informal administrative review; it was not required.  Therefore, the

---

*Younger* applied where plaintiff did not seek administrative remedies and where the federal suit was duplicative and would disrupt state substantive policies).

[65]*Sprint*, 134 S. Ct. at 588 (quoting *NOPSI*, 491 F.3d at 368).

[66]*Id.* at 592 (internal quotation omitted).

administrative review was initiated by Plaintiffs; it was not a coercive proceeding "initiated by the State in its sovereign capacity."[67]  Under *Sprint*, the Court does not find that the KDHE's termination decision was a civil enforcement proceeding.

Tenth Circuit authority also supports the conclusion that the KDHE's termination decision is not the type of proceeding entitled to deference for purposes of *Younger*.  In *Brown ex rel. Brown v. Day*, which was decided before the *Sprint* case, the Tenth Circuit considered whether the district court was correct to abstain in favor of an administrative proceeding for which state court judicial review was still available.[68]  The court decided that this inquiry turned on whether the administrative proceeding is remedial or coercive.[69]  Only coercive administrative proceedings require deference.[70]  To determine whether an administrative proceeding is coercive or remedial, the court should consider: (1) "whether the federal plaintiff initiated the state proceeding of her own volition to right a wrong inflicted by the state (a remedial proceeding) or whether the state initiated the proceeding against her, making her participation mandatory";[71] (2) whether "the federal plaintiff contends that the state proceeding is unlawful (coercive)" or whether "the federal plaintiff seeks a remedy for some other state-inflicted wrong (remedial)";[72] and (3) "if the federal plaintiff sought to thwart a state administrative proceeding initiated to punish the federal plaintiff for a bad act."[73]

First, the "state proceeding" was initiated by the provider Plaintiffs—they opted to avail themselves of an informal administrative hearing before a final termination decision was issued

---

[67]*Id.* (quoting *Trainor v. Hernandez*, 431 U.S. 434, 444 (1986)).

[68]555 F.3d 882, 888 (10th Cir. 2009).

[69]*Id.* at 889.

[70]*Id.* at 888–89.

[71]*Id.* at 889.

[72]*Id.*

[73]*Id.* at 891.

by the KDHE.  If any further administrative appeal is taken before August 10, 2016, it must be initiated by the provider Plaintiffs as well.  Neither the informal administrative hearing nor any administrative appeal is mandatory under Kansas law and Plaintiffs declare that they will not pursue their optional administrative remedy.  Importantly, any potential appeal would only be available to PPKM and PPSLR; the patient Plaintiffs would have no recourse for pursuing their claims in this case.[74]  Second, the provider Plaintiffs do not contend that the administrative proceeding itself was unlawful; they seek a remedy for violations of the federal Medicaid Act and the United State Constitution.  Finally, there is no bad act identified in this case that triggered coercive proceedings.  While the grounds cited for the termination decision allege violations of Kansas law, they were not alleged in the context of a coercive proceeding.[75]  Even if the administrative proceeding in this case is considered ongoing, the Court finds that it is remedial and not coercive, and thus under Tenth Circuit precedent would not constitute a civil enforcement proceeding.

The Court therefore finds that there is no ongoing state administrative proceeding that requires this Court to abstain under *Younger*.  In reaching this conclusion, the Court is mindful

---

[74]*See id.* at 893 ("Brown initiated a challenge to Kansas state action by requesting a hearing before HPF. Kansas did not mandate that she participate in any such proceedings.  Rather, HPF summarily terminated her benefits . . . ."); *see also Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 633 (M.D. La. 2015) ("no administrative proceeding commences until or unless PPGC appeals, and PPGC has foresworn that option. Meanwhile, the Individual Plaintiffs cannot possibly initiate such a proceeding as a matter of state law as Defendant's two lawyers have admitted.); *Shifrin v. Colorado*, No. 09-cv-3040-REB-MEH, 2010 WL 3843083, at *7 (D. Colo. Aug. 11, 2010) (applying *Brown* and finding that the plaintiff initiated the state court proceeding by requesting a hearing after being denied a mortgage license).  This is a particularly important point given that the Court has deferred ruling on whether the providers have standing to raise the Medicaid Act claim in this case on behalf of the patients.

[75]The Court does not agree with Defendant that Judge Marten's decision in *Wright v. McClaskey* commands a different result.  There, the plaintiff did not deny that he was the subject of an ongoing state administrative proceeding.  No. 15-1098-JTM, 2015 WL 5199217, at *5 (D. Kan. Sept. 4, 2015).  The *Brown* factors also applied differently—the administrative proceeding was mandatory, it was not initiated by the plaintiff, and the plaintiff committed an alleged bad act by statutory noncompliance and by failing to pay fines that had been issued to him.  *Id.* at *7.

that the Court's "duty to exercise [its] jurisdiction is so imperative" in the § 1983 context because "Congress specifically created a federal cause of action enforceable in federal courts."[76]

## IV.     Preliminary Injunction Factors

A preliminary injunction "is an extraordinary remedy," so "the right to relief must be clear and unequivocal."[77]  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[78]  A relaxed standard applies if the movant can show that the harm and public interest factors "tip strongly in its favor."[79]  If the movant can make this showing, it can meet the likelihood of success on the merits prong "by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."[80]  However, there is a qualification to the relaxed standard: 'where a preliminary injunction seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the traditional standard applies.[81]  The Court therefore applies the traditional standard in deciding Plaintiff's motion.

### A.     Likelihood of Success on the Merits

Plaintiffs argue that they are likely to succeed on both of their claims—that the State violated the Medicaid Act free-choice-of-provider provision, and the Equal Protection Clause of

---

[76]*Brown*, 555 F.3d at 894.  Because this Court finds that there is no an ongoing proceeding entitled to abstention under *Younger*, the Court does not address the second and third prongs of the abstention doctrine.

[77]*Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

[78]*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[79]*Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).

[80]*Id.*(footnote omitted).

[81]*See, e.g.*, *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.6 (10th Cir. 2006) (quoting *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)).

the Fourteenth Amendment when it terminated the Plaintiff providers from the Medicaid

program.  Because the Court finds that Plaintiffs are likely to succeed on their Medicaid Act

claim, it does not consider the likelihood of success on the merits of the Equal Protection claim

at this time.

Plaintiffs argue that the KDHE's decision to terminate the provider Plaintiffs from

Medicaid violates 42 U.S.C. § 1396a(a)(23), often referred to as the "free-choice-of-provider"

requirement.  "Medicaid is a cooperative federal-state program that provides federal funding for

state medical services to the poor."[82]  State participation in the program is voluntary, "but once a

State elects to join the program, it must administer a state plan that meets federal

requirements."[83]  Section 1396a provides for several requirements for State plans for medical

assistance.  Under § 1396a(a)(23), a State plan must

> provide that (A) any individual eligible for medical assistance (including drugs)
> may obtain such assistance from any institution, agency, community pharmacy, or
> person, qualified to perform the service or services required (including an
> organization which provides such services, or arranges for their availability, on a
> prepayment basis), who undertakes to provide him such services, and (B) an
> enrollment of an individual eligible for medical assistance in a primary care case-
> management system (described in section 1396n(b)(1) of this title), a Medicaid
> managed care organization, or a similar entity shall not restrict the choice of the
> qualified person from whom the individual may receive services under section
> 1396d(a)(4)(C) of this title, except as provided in subsection (g) of this section, in
> section 1396n of this title, and in section 1396u-2(a) of this title, except that this
> paragraph shall not apply in the case of Puerto Rico, the Virgin Islands, and
> Guam, and except that nothing in this paragraph shall be construed as requiring a
> State to provide medical assistance for such services furnished by a person or
> entity convicted of a felony under Federal or State law for an offense which the
> State agency determines is inconsistent with the best interests of beneficiaries
> under the State plan or by a provider or supplier to which a moratorium under
> subsection (kk)(4) is applied during the period of such moratorium.

1.      **Whether § 1396a(a)(23) creates an enforceable right that may be vindicated
        under  42 U.S.C. § 1983**

---

[82]*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (1986).

[83]*Id.*

Defendant first challenges whether the free-choice-of-provider provision creates an enforceable right that may be vindicated under § 1983.  All of the circuit courts to consider this issue have concluded after a thorough analysis that Medicaid patients may bring an enforcement action under § 1983 to vindicate their rights under this provision.[84]  To determine whether a federal statute provides a private right of action under § 1983, three factors guide the Court's analysis:

> First, Congress must have intended that the provision in question benefit the plaintiff.  Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.[85]

The Supreme Court has cautioned that "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action."[86]

This Court follows the Sixth, Ninth, and Seventh Circuits in holding that the patient Plaintiffs have a private right of action to enforce the Medicaid free-choice-of-provider provision under this three factor test.  The statute creates unambiguous rights-creating language sufficient to show that Congress intended to benefit Medicaid beneficiaries.[87]  The statute provides courts with sufficiently concrete and objective standards for enforcement by requiring states to

---

[84]*Harris v. Olszewski*, 442 F.3d 456, 461–65 (6th Cir. 2006); *Planned Parenthood of Ind., Inc.v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 972–77 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2736 (2013); *Planned Parenthood v. Betlach*, 727 F.3d 960, 965–68 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1283 (2014).  *But cf. Silver v. Baggiano*, 804 F.2d 1211, 1217–18 (11th Cir. 1986)  (remanding case to district court to consider whether § 1396a(a)(23) is enforceable by the health care provider, given that it had not been decided below, and given that a patient who was "an actual recipient" had moved to intervene in the case), *abrogated on other grounds by Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613 (2002).

[85]*Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997) (citations omitted).

[86]*Gonzaga Univ. v. Doe*, 536 U.S. 273, 286 (2002).

[87]*Betlach*, 727 F.3d at 966–67; *Comm'r of Ind.*, 699 F.3d at 974; *Harris*, 442 F.3d at 461–62.

determine whether a "provider is qualified to perform the services required," and whether the provider "undertakes to provide such services."[88]   And the statute is couched in mandatory terms because it says that states "must provide" in their Medicaid plans that beneficiaries can choose from a provider qualified to perform the medical services required.[89]   The Medicaid Act does not otherwise foreclose a private cause of action through § 1983.[90]   "Neither is the Act's requirement that States 'grant[ ] an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the [State] plan is denied,' 42 U.S.C. § 1396a(a)(3), inconsistent with a private action under § 1983."[91]

Defendant argues that a more recent Supreme Court decision dictates a different result. In *Armstrong v. Exceptional Child Center, Inc.*[92] the Supreme Court considered whether a different subsection of § 1396a(a) confers a private right of action to Medicaid providers. Subsection (30)(A) requires State plans to:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

The lower court found that the plaintiff providers had an implied right of action under the Supremacy Clause to seek injunctive relief against enforcement of state legislation that failed to set rates in a manner consistent with § 30(A).[93]   The Supreme Court disagreed, holding that there

---

[88]*Betlach*, 727 F.3d at 967; *Comm'r of Ind.*, 699 F.3d at 974; *Harris*, 442 F.3d at 462.

[89]*Betlach*, 727 F.3d at 967; *Comm'r of Ind.*, 699 F.3d at 974; *Harris*, 442 F.3d at 462

[90]*Harris*, 442 F.3d at 462.

[91]*Id.* at 463 (citing *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 520–22 (1990)).

[92]135 S. Ct. 1378 (2015) (plurality opinion).

[93]*Id.* at 1382.

was no implied right of action under either the Supremacy Clause, or in equity.[94]  Justice Scalia

further wrote that Congress did not provide a private right of action under the Medicaid Act

itself.[95]  In explaining that the Medicaid Act conferred no cause of action, Justice Scalia reasoned

that (1) § 30(A) lacked "rights-creating language needed to imply a private right of action," and

(2) that intended beneficiaries of a contract are generally unable to sue where the contract is

between two governments, as with the Medicaid Act, at least in the absence of an

"unambiguously conferred" private right of action."[96]  But this portion of Justice Scalia's opinion

was not joined by a majority of justices and is therefore not binding.[97]  Moreover, the Court

agrees with Plaintiffs that *Armstrong*'s holding is narrow and applies only to subsection 30(A),

which does not contain the type of rights-creating language contained in subsection 23.  As the

Court noted in *Armstrong*, § 30(A) "is phrased as s directive to the federal agency charged with

approving state Medicaid plans," whereas § 23 allows "any individual" to choose among

qualified providers who undertake to provide medical services.[98]  Further, § 30(A) is a rate

setting statute that that contains a broad standard that would be difficult to judicially

administer.[99]  Plaintiffs are likely to succeed in arguing that the Jane Doe Plaintiffs have a

private right of action under § 1983 to enforce their rights under § 1396a(a)(23).

Defendant argues for the first time in the motion to dismiss that if there is a private right

of action, it runs only to Medicaid patients and therefore PPKM and PPSLR lack standing to

---

[94]*Id.* at 1383–87 & 1388 (Breyer, J., concurring).

[95]*Id.* at 1383–87.

[96]*Id.* at 1387–88.

[97]*Id.* at 1388 (Breyer, J., concurring); *see Altria Grp., Inc. v. Good*, 555 U.S. 70, 555 (2008) ("Because the 'plurality opinion . . . did not represent the views of a majority of the Court, we are not bound by its reasoning.'" (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 81 (1987))).

[98]*Accord Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 640–41 (M.D. La. 2015).

[99]*Accord Planned Parenthood S.E., Inc. v. Bentley*, 141 F. Supp. 3d 1207, 1217–18 (M.D. Ala. 2015).

assert a claim under § 1396a(a)(23).  Because the Court finds that the Jane Doe Plaintiffs have a private right of action, the Court need not resolve at this time whether PPKM and PPSLR have standing in their own right, or on behalf of the patients, in order to grant injunctive relief.  The Court will instead consider this issue in the context of the motion to dismiss, after allowing full briefing.

### 2.    Whether there is a violation of § 1396a(a)(23)

The free-choice-of-provider requirement is subject to two limitations: "(1) the provider is 'qualified to perform the service or services required,' and (2) the provider 'undertakes to provide [the recipient] such services.'"[100]  All courts to consider the question have determined that the term "qualified" is unambiguous and may be defined according to its ordinary meaning,[101] which is "having an officially recognized qualification to practice as a member of a particular profession; fit, competent."[102]  In the context of the statute, a provider must be "qualified to perform the service or services required," so the provider therefore must "be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner."[103]  The Seventh and Ninth Circuits have both held that under this standard, States are not permitted "to establish provider-eligibility criteria based on any legitimate state interest."[104]

---

[100]*Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 967 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1283 (2014) (quoting § 1396a(a)(23)).

[101]*Id.* at 969 (quoting Oxford English Dictionary (3d ed. 2007)); *see also, e.g.*, *Comm'r of Ind.*, 699 F.3d at 978 (citing Black's Law Dictionary 1360 (9th ed. 2009)) .

[102]*See id.* at 969; *Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 978 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2736 (2013); *Kliebert*, 141 F. Supp. 3d at 643; *Planned Parenthood Ark. & E. Okla. v. Selig*, No. 4:15-cv-00566-KGB, Doc. 45 at 26–27(E.D. Ark. Oct. 5, 2015), attached as Doc. 13, Ex. 4.

[103]*Comm'r of Ind.*, 699 F.3d at 978.

[104]*Id.*; *Betlach*, 727 F.3d at 970 ("Giving the word 'qualified' such an expansive meaning would deprive the provision within which it appears of any legal force.").

Defendant does not contest this meaning of "qualified" in its brief, nor does it argue that the Provider Plaintiffs are not qualified under § 1396a(a)(23).[105]   Instead, Defendant argues that Plaintiffs brought their claim under the wrong statute because they challenge the decision to terminate the provider agreements, not the lack of patient choice.   The Court disagrees and follows the guidance provided by another district court that considered an identical argument.   In *Planned Parenthood S.E., Inc. v. Bentley*,[106] the United States District Court for the Middle District of Alabama explained that the scope of the patients' claim was that their provider of choice was wrongfully excluded from the pool of providers from which they have a right to choose:

> If a State could defeat a Medicaid recipient's right to select a particular qualified healthcare provider merely by terminating its agreement with that provider on an unlawful basis, the right would be totally eviscerated. If the Governor and the Acting Commissioner were correct that allegedly unlawful terminations of provider agreements could not be challenged by recipients pursuant to the free-choice-of-provider provision, that provision's "*individual* entitlement," the "personal right" it gives recipients, would be an empty one.[107]

The Court finds that Plaintiffs properly brought their claim under the free-choice-of-provider requirement because they allege that the Jane Doe Plaintiffs were denied their right to receive covered Medicaid services from any qualified provider of their choice willing to provide the services.   They contend that their provider was wrongfully removed from the pool of providers.

The Court therefore proceeds to consider Defendant's position that it properly terminated PPKM and PPSLR under the exclusion provision of the Medicaid Act, § 1396a(p)(1).   That provision states:

---

[105]Because the Court finds that the free-choice-of-provider statute is unambiguous, the Court does not defer to the CMS Administrator's interpretation of that statute.  *See Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *Comm'r of Ind.*, 699 F.3d at 980; *Betlach*, 727 F.3d at 975.

[106]141 F. Supp. 3d 1207, 1217–18 (M.D. Ala. 2015).

[107]*Id.* at 1218 (citations and footnote omitted).

> In addition to any other authority, a State may exclude any individual or entity for purposes of participating under the State plan under this subchapter for any reason for which the Secretary could exclude the individual or entity from participation in a program under subchapter XVIII of this chapter under section 1320a-7, 1320a-7a, or 1395cc(b)(2) of this title.[108]

This provision permits termination in two ways: (1) for any reason that the Secretary could exclude under the cross-referenced Medicaid Act provisions, and (2) pursuant to the "any other authority," savings clause.  Under the savings clause, Defendant argues that it may terminate a provider agreement if it determines that the providers violated Kansas law or some other federal law.

### 1.      Alleged Medicaid Act Violations

Defendant first argues that it was justified in terminating the providers' Medicaid provider agreements under 42 U.S.C. § 1320a-7(b), which provides for permissive termination under circumstances involving certain types of fraud and malfeasance.  Plaintiffs are likely to succeed in showing that this statute does not justify the termination decisions.

### a.      § 1320a-7(b)(5)

Under § 1320a-7(b)(5)(B), the Secretary of Health and Human Services may terminate "any individual or entity" "for reasons bearing on the individual's or entity's professional competence, professional performance, or financial integrity."  Defendant contends that all three grounds it provided for the provider Plaintiffs' terminations constitute violations of this statute.  Plaintiffs are likely to demonstrate that this statute is inapplicable for several reasons.  First, under § 1396a-p(1), the "entity" that a "State may exclude" must be the same entity that committed the infraction defined in § 1320a-7(b).[109]  Although the statute allows for exclusion of an entity based on affiliation with "a sanctioned individual," that only applies when the affiliated

---

[108] 42 U.S.C. § 1396a(p)(1).

[109] *Bentley*, 141 F. Supp. 3d at 1223–24 & n.9.

"person" is sanctioned under the Medicaid Act and has an ownership or control interest in the entity, or is an officer, director, agent, or managing employee.[110]  Defendant points the Court to no authority that Congress intended to otherwise allow for exclusion based solely on affiliation outside of the strict confines of the statutory provision.  There is no dispute that neither PPKM, PPSLR, nor their current or former employees were portrayed on the CMP videos.  There is no dispute that the provider Plaintiffs have no direct or indirect ownership or control interest of five percent or more in PPFA or the affiliate identified in the videos.  There is no dispute that PPKM and PPSLR do not participate in fetal tissue donation or sale.  There is no dispute that PPKM and PPSLR are not the subjects of any Medicaid billing fraud claim relied upon by the KDHE in their notices of intent to terminate.

Defendant points the Court to evidence that Governor Mary Fallin of Oklahoma has called for termination of her State's Medicaid provider contracts with the two Planned Parenthood affiliates located there.  She cites two October 2015 Integrity Reviews, finding a 20.3% and 14.1% billing error rate.[111]  The Governor's comments come from a letter she sent to the Director of the Oklahoma Health Care Authority Board, encouraging him to consider terminating these two affiliates' Medicaid provider contracts.  Outside of these integrity reviews, which are not part of this record, Governor Fallin points to False Claims Act cases in other states.  There is no evidence about the action taken, if any, by the Oklahoma Health Care Authority Board based on this letter.  Defendant argues that this evidence directly relates to PPKM given its intended merger with Planned Parenthood of Central Oklahoma, one of the affiliates referenced in Governor Fallin's letter.  But on this record, the Court finds that Plaintiffs would succeed in arguing that the Oklahoma affiliate was not sanctioned under either the

---

[110]42 U.S.C. § 1320a-7(b)(8).

[111]Doc. 37-5, Ex. 1-D.

Medicaid Act, or Oklahoma law, and that it does not have an ownership or controlling interest in PPKM.

Plaintiffs are likely to succeed in arguing that § 1320a-7(b) does not apply by virtue of affiliation, and therefore could not be applied to the provider Plaintiffs in this case as to two of the grounds for termination: the videos and the alleged Medicaid fraud.  It also renders the grounds for termination against PPSLR entirely baseless since the KDHE inspection involved only one PPKM clinic.

The Court further finds that Plaintiffs are likely to succeed in showing that PPKM's purported failure to cooperate with the BWM's solid waste inspection in December 2015 does not bear on PPKM's "professional competence, professional performance, or financial integrity."[112]  First, it is undisputed that no solid waste violations were found, so the only basis for termination associated with the inspection was the alleged failure to cooperate.  Defendant cannot explain how the failure to cooperate in the inspection, standing alone, bears on PPKM's competence, performance, or financial integrity.  Second, although the evidence makes clear that PPKM prohibited the inspectors from taking photographs of the facility on the first visit, and that it negotiated with the KDHE to maintain the confidentiality of its solid waste vendors before identifying them, there is no evidence that PPKM otherwise prevented the inspectors from performing their inspections.  Although the BWM officials have submitted declarations stating that photographs of certain solid waste disposal containers were warranted, there is nothing in the regulatory authority that required PPKM to allow photographs to be taken.  K.A.R. § 28-29-

---

[112]Although Defendant does not make this argument in responding to the preliminary injunction motion, the Court further finds that the inspection basis for termination does not touch upon PPKM's qualifications under § 1396a(a)(23) given the undisputed fact that the inspection did not reveal any infractions that touch upon PPKM's capability of performing the needed medical services in a professionally competent, safe, legal, and ethical manner. In addition to finding no evidence of solid waste disposal infractions, the KBHA previously investigated PPKM in relation to the CMP videos and found  no further action should be taken.  This finding was reached in between the first and second attempts to conduct a solid waste inspection.

16 provides these inspectors with authority to "gather information of existing conditions and procedures," but it does not require photographs be taken.  There is no dispute in the record that PPKM would have allowed the inspection to continue but for the inspectors' insistence on taking photographs.  It was the BWM inspectors who opted to leave instead of continuing without photographs.  More importantly, there was never any determination made by BWM or the KDHE that PPKM hindered the solid waste inspection—no enforcement action was ever brought against the facility.  Given this record, Plaintiffs are likely to succeed in showing that they were not properly excluded from the Medicaid program under § 1320a-7(b)(5).

**b.**      **§ 1320a-7(b)(12)**

Next, Defendant claims that the termination decisions were justified under § 1320a-7(b)(12)(B), which allows the Secretary to terminate a provider "that fails to grant immediate access, upon reasonable request (as defined by the Secretary in regulations) . . . (B) To the Secretary or the State agency, to perform the reviews and surveys required under State plans under paragraphs (26), (31), and (33) of section 1396a(a) of this title and under section 1396b(g) of this title."  Section 1396a(a)(33), requires a State health or other appropriate medical agency to establish a plan for "the review by appropriate professional health personnel of the appropriateness and quality of care and services furnished to recipients of medical assistance under the plan in order to provide guidance with respect thereto in the administration of the plan to the State agency."  The Court finds that Plaintiffs are likely to succeed in demonstrating that the solid waste inspection here does not constitute a review bearing on "the appropriateness and quality of care and services furnished to recipients of medical assistance under the plan."  As already discussed, the failure to cooperate in the inspection, standing alone, does not implicate PPKM's competence, performance, or financial integrity.  Moreover, Plaintiffs have shown a

likelihood of success in their contention that they did grant immediate access to the inspectors. And even after the inspectors insisted on taking photographs and obtaining confidential material, PPKM allowed the inspection to continue; the inspectors opted to come back in January instead.

**c.      § 1320a-7(a)(1), (3), or (b)(1)(A)(ii)**

Finally, Defendant appears to argue that its decision was justified under § 1320a-7(a)(1), (3), or (b)(1)(A)(ii) based on evidence that other PPFA affiliates submitted false Medicaid claims.[113]  Plaintiffs are likely to succeed in arguing that these provisions are entirely inapplicable because they all either require or permit exclusions based on criminal convictions. Moreover, as described above, they are tied to the conduct of other entities, not the Plaintiff providers that have been excluded by the KDHE.  Defendant's contention that there is an impending merger between PPKM and Planned Parenthood of Central Oklahoma does not change this analysis.  At the time of the termination decisions, this planned merger was not known to the State, so it could not have formed the basis for its termination decision.  p

**2.      Savings Clause**

Defendant makes the same argument advanced and rejected by the many courts that have been called upon to review whether termination decisions under the Medicaid Act violate the free-choice-of-provider provision: that under the savings clause, the states have plenary power to exclude providers as they deem fit under § 1396a(p)(1) without running afoul of the free-choice-of-provider provision.[114]  To be sure, the Seventh Circuit in *Planned Parenthood of Indiana, Inc. v. Commissioner of the Indiana State Department of Health*, acknowledged that the states retain regulatory authority over provider qualifications in terms of "licensing standards and other

---

[113]*See* Doc. 37 at 34–35.

[114]*Betlach*, 727 F.3d at 971–72; *Comm'r of Ind.*, 699 F.3d at 979; *Bentley*, 2015 WL 6517875, at *9–10; *Selig*, Doc. 13-5 at 25.

related practice qualifications," but the claim in this case, like in the Seventh Circuit's case "raises a question about the *limits* of that authority."[115]  The Seventh Circuit also explained that the savings clause "signals only that what follows is a non-exhaustive list of specific grounds upon which states may bar providers from participating in Medicaid.   It does not imply that the states have an unlimited authority to exclude providers for any reason whatsoever."[116]  As the court explained, if states were able to exclude a provider based on any rule that they declared related to qualifications, it "would make the free-choice-of-provider requirement a nullity."[117]  The nonexhaustive list of grounds for excluding a provider cross-referenced in the statute refer to "various forms of malfeasance such as fraud, drug crimes, and failure to disclose necessary information to regulators."[118] Therefore, the statute's "savings clause empowers states to exclude individual providers on such grounds directly, without waiting for the Secretary to act, while also reaffirming state authority to exclude individual providers pursuant to analogous state law provisions relating to fraud or misconduct."[119]

Defendant argues that PPKM violated state law by refusing to cooperate with a solid waste inspection in December 2015, which makes it unlawful for a person to interfere with a solid waste inspection.  But as already discussed, the Court finds the Plaintiffs are likely to succeed in showing that they did not run afoul of state regulations by refusing to allow the BWM inspectors to take photographs in the facility while patients were present.  And there is no evidence that PPKM was cited for  impeding an inspection.  The  KDHE argues that it was justified in inferring that there was a solid waste violation by PPKM's refusal to allow inspectors

---

[115]*Comm'r of Ind.*, 699 F.3d at 979.

[116]*Id.*

[117]*Id.*

[118]*Id.*; *Betlach*, 727 F.3d at 972.

[119]*Betlach*, 727 F.3d at 972.

to "do their job," when viewed in conjunction with the YouTube videos.  But the KBHA conducted a "thorough investigation" into PPKM after the CMP videos were released, and issued its finding that no further action be taken after PPKM allegedly interfered with the first solid waste inspection.  And it is undisputed that PPKM does not participate in fetal tissue donation or sale.  After the KBHA finding was issued, and after the parties negotiated BWM's permission to take certain photographs and receive confidential solid waste vendor information, the BWM was able to finish its unannounced inspection and found no infractions.

Finally, Defendant argues that it was justified in terminating the providers' Medicaid contracts based on the video evidence that Planned Parenthood affiliates "have sold body parts and manipulated abortions.  These violations likely run afoul of State and Federal law, contravene the terms of the provider agreement, and fall well below the professional standard of care."[120]  Assuming, without deciding that PPFA or other Planned Parenthood affiliates violated state and federal laws concerning fetal tissue donation, the providers in this case are likely to succeed in showing that such conduct cannot be attributed to them under the law.  Based on the record provided to the Court, which is largely comprised of publicly available documents and the attestation of PPKM and PPSLR executives, PPKM and PPSLR are separate and distinct entities from those described in the video transcripts.  Plaintiffs are likely to succeed in arguing that they cannot be terminated under Kansas law on the basis of this affiliation.[121]

First, Defendant cites several state law cases that explain when piercing the corporate veil is warranted.[122]  The Court cannot discern the relevance of these cases where it is undisputed that the Plaintiff affiliates are neither subsidiaries of PPFA, nor officers or shareholders in PPFA.

---

[120]Doc. 37 at 28.

[121]See K.A.R. § 30-5-60(14), (15).

[122]*Milgo Elec. Corp. v. United Bus. Commc'ns, Inc.*, 623 F.2d 645, 659 (10th Cir. 1980); *NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1052 (10th Cir. 1993).

"None of these decisions stands for the proposition that one corporation can be held responsible for the policies of an umbrella organization regarding a practice that other *affiliated* corporations engage in."[123]

Next, Defendant asserts that there is financial overlap between the affiliates, which she characterizes as "spokes of a common hub."  Defendant relies on PPFA's financial statements, to show that the affiliates are required to pay dues that are redistributed in part back to the affiliates, and that the Annual Report is a joint balance statement.  The Court does not read the financial statements as sweepingly as the Defendant.  The joint financial statement referenced by Defendant states that, "the accompanying consolidated financial statements do not include the financial position or the changes in net assets and cash flows of these independent affiliated organizations."[124]  There is no evidence that dues paid to PPFA and returned in part to the affiliates translates into quid pro quo action on the part of the affiliates.  Plaintiffs have submitted evidence that PPFA exerted no control or ownership interest in PPKM or PPSLR in providing this funding.

Defendant next argues that PPFA and its fifty-nine affiliates have a "unity of interest" that is evidenced by certain language used by PPFA and it officers when describing the organization and its affiliates.  But again, Plaintiffs are likely to succeed in showing that these stray references to the organizational structure does not overcome the declarations and other legal statements showing that PPKM and PPSLR are independent entities that are merely members of PPFA.  The record shows that PPFA does not provide medical services or operate health centers.  As described in *Bentley*, there is no evidence

---

[123]*Planned Parenthood S.E., Inc. v. Bentley*, 141 F. Supp. 2d 1207, 1224  n.10 (M.D. Ala. 2015) (citations omitted).

[124]Doc. 37-9, Def. Ex. 1-H at 9.

> that PPFA had adopted and enforced a policy *requiring* that all affiliates engage in fetal-tissue donation, alter abortion procedures to better preserve intact specimens, and accept compensation in excess of costs. . . .  [A]t most [they] suggest that PPFA has supported the decisions of some affiliates to engage in these practices. . . .  What PPFA *permits* other affiliates to do therefore has no bearing on PPSE, which to reiterate, has elected not to engage in fetal-tissue donation.[125]

Defendant cites the transcript from one of the CMP videos, suggesting that PPFA coordinates fetal tissue donation policy with its affiliates.  Assuming the authenticity of this video, which has not yet been provided to the Court, any question that the KDHE had about such coordination is negated by the fact that the KBHA conducted a thorough investigation of the allegations in those videos and found no evidence to support such activity by PPKM.  Likewise, the Missouri Attorney General investigated and cleared PPSLR of wrongdoing.

Finally, Defendant points to filings in another case involving affiliate Planned Parenthood of the Great Northwest, Inc. ("PPGNW"), as evidence that PPFA and its affiliates present themselves as "a single organization."[126]  But again, neither PPKM nor PPSLR were parties in that case and made no representations that relate to their status.  Second, the Court does not agree with Defendant's reading of the Appellee's brief in that case.  That case was brought as a qui tam action alleging certain overbilling practices by PPGNW.  PPGNW argued that there was adequate prior public information about the billing practices in question that had been litigated in a prior qui tam suit with an affiliate in California, and so the relator in that case was not a whistleblower, but "an opportunistic plaintiff."[127]

---

[125]*Id.* at 1224.

[126]Doc. 37-15, Ex. 1-N, *Bloedow v. Planned Parenthood of the Great Nw., Inc.*, No. 14-35017, Appellee Br. at 5 (9th Cir. July 2, 2014).

[127]*Id.*

In sum, the Court determines that Plaintiffs are likely to succeed on the merits of their claim that PPKM and PPSLR may not be terminated as Kansas Medicaid providers based on the activities of other Planned Parenthood affiliates.

### B.        Irreparable Harm

To constitute irreparable harm, the injury "must be both certain and great."[128]  It "is often suffered when 'the injury can[not] be adequately atoned for in money,' or when 'the district court cannot remedy [the injury] following a final determination on the merits.'"[129] The Court has withheld ruling on whether the provider Plaintiffs have representational standing to raise the Medicaid Act claim.  Likewise, because the Court finds that the Jane Doe Plaintiffs have demonstrated irreparable harm without injunctive relief, the Court need not proceed to consider whether Plaintiffs have shown irreparable harm to PPKM and PPSLR.  The Jane Doe Plaintiffs' declarations establish that they choose to be treated at PPKM due to scheduling conveniences, and that they have had positive experiences with PPKM staff as compared to other providers for gynecological services.  All three Plaintiffs rely on Medicaid for their health insurance and all three wish to continue to be treated at Planned Parenthood clinics.  Jane Doe #3 was 33 weeks pregnant at the time she executed her declaration, and given her status as an established patient at PPKM, it is important to her to be able to return there for her reproductive health care after the baby is born.

Defense counsel suggested at oral argument that the Jane Doe declarations filed in this case were not specific enough because they lacked information such as how far away alternative providers are located.  The Court does not require such detailed information from these Plaintiffs

---

[128]*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quoting *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

[129]*Id.* (quoting *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (1980)).

in order to credit their declarations of injury.  As already discussed, the Court gives weight to their uncontroverted declarations that they depend on Planned Parenthood clinics for their reproductive health care, and that these Planned Parenthood clinics are their providers of choice for a host of reasons.  They are happy with the quality of care they receive, they do not feel judged by the provider's staff, and they have indicated scheduling and convenience benefits to being treated by these providers.  Defense counsel also suggested that the fact that these patients could still be treated at PPKM, albeit without Medicaid reimbursement, negates any finding that they could not be treated by the provider of their choice.  It is uncontroverted that to be eligible for Medicaid assistance, a family of four must have a net income of $768 per month or less.  The Court easily finds that these patients will be unable to afford to pay out of pocket to see the health care provider of their choice without Medicaid assistance.

In 2014, PPKM and affiliated providers provided family planning services at approximately 750 visits to nearly 500 Medicaid patients.  In 2015, PPKM and affiliated providers provided services at over 650 visits to nearly 450 Medicaid patients.  PPSLR operates a health center in Joplin, Missouri, which is located approximately seven miles from the Kansas border and provides family planning health services to a small number of Kansas Medicaid patients each year.  These clinics offer important health services, including: annual exams, contraception and contraceptive counseling, hormonal counseling, screening for breast cancer, screening and treatment for cervical cancer, screening and treatment for STIs, including HPV vaccines, pregnancy testing and counseling, and other limited general health services.  Many of these clinics are located in places with health care provider shortages.  Plaintiffs have demonstrated that both the named Jane Doe Plaintiffs, and hundreds of other Kansas Medicaid patients that currently depend on PPKM and PPSLR for their family planning and reproductive

health services would be unable to be treated by these providers if they are terminated from the

KanCare/Medicaid program.  A disruption or denial of these patients' health care cannot be

undone after a trial on the merits.  The Court finds that Plaintiffs has shown irreparable harm to

Medicaid patients who have chosen PPKM and PPSLR as their family planning and reproductive

health care providers.

Defendant submits evidence that Kansas Medicaid recipients can choose from other

qualified family planning providers in Kansas.  But as several courts have found, this argument

"misses the mark" because "[t]hat a range of qualified providers remains available is beside the

point.  Section 1396a(a)(23) give Medicaid patients the right to receive medical assistance from

the provider of their choice without state interference save on matters of provider

qualifications."[130]  Moreover, the evidence submitted by Defendant in support of its claim that

Medicaid patients will have access to other health care providers is exaggerated.  Defendant

submits a report based on procedure codes that are "commonly used by certain obstetric and

gynecological medical providers," resulting in a list of 9199 Kansas Medicaid providers.[131]  A

cursory review of this list shows that the same providers are listed multiple times, and many of

the listed providers appear to have practices wholly unrelated to family planning and

reproductive health services, such as sleep centers, podiatrists, and dermatologists.  The Court

cannot conclude from this evidence that the Kansas Medicaid patients who choose PPKM and

---

[130]*Planned Parenthood of Ind., Inc.v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 981 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2736 (2013); *Planned Parenthood S.E., Inc. v. Bentley*, 141 F. Supp. 2d 1207, 1225– 26 (M.D. Ala. 2015); *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 650  (M.D. La. 2015); *Planned Parenthood Ark. & E. Okla. v. Selig*, No. 4:15-cv-00566-KGB, Doc. 45 at 22 (E.D. Ark. Oct. 5, 2015), attached as Doc. 13, Ex. 4.

[131]Doc. 37-21, Ex. 5 ¶¶ 3–4.

PPSLR for their family planning could be assured of  "ready and convenient" alternative reproductive health services in the absence of an injunction.[132]

Finally, Defendant urges that the availability of administrative review negates the imminence of patient harm because it could be months before the provider terminations become effective, and because the harm is within Plaintiffs' control.  First, as already discussed at length, there is no requirement that the providers pursue a fair hearing in order to obtain relief in this Court, and the providers have stated on the record that they do not intend to pursue that channel of relief.  It is certain therefore that the KDHE's termination decisions will become final on August 10, 2016, at the latest.  There is no evidence or legal authority in this record that the termination decisions would not be enforced on the July 7 effective date stated in the termination letter, or pending an administrative appeal if one was filed, other than defense counsel's assertions in the briefs.  Second, as the Court has already discussed, PPSLR has no contracts with KanCare MCOs, so the contractual extension would not apply to it.  Third, there are dueling contractual provisions in the record that make it unclear how quickly the MCOs would terminate their contracts with PPKM.  Fourth, Plaintiffs have submitted authority that the termination decisions themselves may create a domino effect because termination from the Kansas program puts PPKM and PPSLR at risk of termination in neighboring states—PPKM is also a Missouri and soon-to-be Oklahoma provider and PPSLR is also Missouri and Illinois Medicaid provider. Regulations in Oklahoma and Missouri allow for those Medicaid programs to terminate a provider based on termination decisions in other states; they are not tied to the "effective date" of the other state's Medicaid provider terminations. [133]  Therefore, not only is there strong evidence

---

[132]*See Kliebert*, 141 F. Supp. 3d at 650.

[133]Mo. Code Regs. tit. 13, § 70-3.030(3)(A)(12), (13), (14), (18), (19); Okla. Admin. Code § 317:30-3-19.1(2).

that Kansas Medicaid patients will be irreparably harmed by the termination decisions, but there is also a risk that Medicaid patients in neighboring states will lose PPKM and PPSLR as their chosen providers as early as July 7.  For all of these reasons, the Court finds that Plaintiffs have alleged a sufficiently imminent irreparable harm that justifies issuing injunctive relief.

  **C.**  **Balance of Harms and Public Interest**

  Defendant contends that it will suffer irreparable harm if an injunction ensues, because it would allow taxpayer money to flow to the provider Plaintiffs despite evidence that they have violated Federal and State law, the terms of their provider agreements, and applicable professional standards.  Defendant further argues that an injunction would disrupt ongoing administrative proceedings.  Plaintiffs urge that the irreparable harm it has cited cannot be undone, particularly the domino effect that a for cause termination could have by allowing other states to terminate based on the Kansas decision.  Plaintiffs further argue that it is in the public interest to preserve patients' freedom to choose their provider without government interference and that an injunction would simply freeze the status quo of reimbursing these providers until a decision can be reached on the merits.

  The Court is not persuaded that the risk of taxpayer harm if the Court issues the injunction outweighs the established irreparable injury to Kansas Medicaid patients if an injunction does not issue.  As the Court has explained, neither the fetal tissue donation allegation nor the Medicaid fraud allegation have any relation to the Planned Parenthood affiliates who were terminated by the KDHE, so no taxpayer money is at risk of flowing to providers that have violated State or Federal law on those grounds.  And Plaintiffs have made a strong showing that the solid waste disposal ground for termination is unrelated to the provider's qualifications as defined in § 1396a(a)(23).  Given these showings, the risk of taxpayer harm is quite low as

compared to the certain injury to Medicaid patients if the injunction does not issue—they will be unable to seek treatment from their providers of choice.  This is a right explicitly provided in the Medicaid Act, and the Court finds that protecting this right until the case can be decided on the merits is in the public interest.

The Court further finds that the injunction will not interfere with an ongoing administrative proceeding.  As the Court has explained throughout this opinion, there is no "ongoing" administrative proceeding to interfere with and Plaintiffs have made clear that they will not be exercising their optional right to a fair hearing.  Moreover, Defendant cannot explain how this implicates the balance of harms.  If, for example, Plaintiffs opted to avail themselves of the administrative process and the KDHE reversed its decision, Defendant could always ask this Court for relief from the preliminary injunction.[134]  Similarly, if the intended merger between PPKM and Planned Parenthood of Central Oklahoma ultimately requires not just a name change to the PPKM entity for which the KDHE's termination decision would extend, but instead an entirely new Medicaid provider identification number and provider agreement for which the termination decision potentially would not apply, the parties can apply to this Court for relief from the preliminary injunction.

Moreover, the Supreme Court has explained that requiring administrative exhaustion of state remedies for a § 1983 claim is inconsistent with Congressional intent that the statute "interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'"[135]  The Court thus finds it to be in the

---

[134] *See Comm'r of the Ind.*, 699 F.3d at 981 (rejecting state's claim that preliminary injunction will undermine the public's interest in the administrative process).

[135] *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 503–07 (1982) (quoting *Mitchum v. Foster*, 407 U.S. 225, 242 (1972)).

public interest's to allow Plaintiffs to pursue their federal claims in federal court notwithstanding the availability of state administrative remedies.

The Court further finds that it is in the public's interest to ensure that the goals of Medicaid are served—"to afford medical assistance to persons whose income and resources are insufficient to meet the financial demands of necessary care and services."[136]  Medicaid patients have the explicit right to seek family planning services from the qualified provider of their choice.[137]  It is uncontroverted that PPKM and PPSLR serve hundreds of underprivileged women in the State of Kansas.  It is in the public interest to allow these individuals to be treated by the qualified provider of their choice, and to have that provider reimbursed under Medicaid pending a trial on the merits in this case.

In sum, Plaintiffs have satisfied the elements required to obtain a preliminary injunction on the Jane Doe Plaintiffs' Medicaid Act claim.  The KDHE's termination decisions shall therefore be held in abeyance until the case can be decided on the merits.

### D.    Security

Plaintiffs asks that the preliminary injunction be issued without a bond requirement.  Fed. R. Civ. P. 65(c) provides that "[t]he Court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Court may exercise its discretion, and determine a bond is unnecessary "if there

---

[136]*Hougton ex rel. Houghton v. Reinerston*, 382 F.3d 1162, 1164 (10th Cir. 2004) (quoting *N.M. Dep't of Human Servs. v. Dep't of Health & Human Servs. Health Care Fin. Admin.*, 4 F.3d 882, 883 (10th Cir. 1993)).

[137]42 U.S.C. § 1396a(a)(23); *see also, e.g.*, *Planned Parenthood S.E., Inc. v. Bentley*, 141 F. Supp. 2d 1207, 1217 (M.D. Ala. 2015) ("Congress saw fit to identify family planning as the area of medical care with respect to which a recipient's free choice of provider was most critical. It is not hard to imagine why—just as business owners do, healthcare providers and Medicaid recipients have widely varying "honest conviction[s]" about the appropriateness of different family-planning methods." (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014)).

is an absence of proof showing a likelihood of harm."[138]  The Court finds no evidence of financial harm to the State if the Court does not require a bond; the State would simply continue reimbursing the Plaintiff providers as it has before and since the termination decision, until a decision on the merits can be reached.  No bond is required.

## V.   Motion for Class Certification

Also pending is Plaintiffs' Motion for Class Certification.  In their motion, Plaintiffs seek to certify a class of all Kansas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services from PPKM and PPSLR and their current affiliated providers.[139]  The motion is brought pursuant to Fed. R. Civ. P. 23(b)(2), which applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

The injunctive relief requested in this case does not require individualized remedies.  Moreover, case law supports this Court's authority to issue classwide injunctive relief based on its general equity powers before deciding a class certification motion.[140]  Additionally, the so-called "necessity doctrine" has been invoked by most circuits in Rule 23(b)(2) cases, requiring a need for class relief.[141]  Class relief is denied under this doctrine where the putative class members will benefit from any injunction issued on behalf of the individual plaintiffs.  Both

---

[138]*Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987).

[139]Doc. 14 at 1.

[140]*See, e.g., Rodriguez v. Providence Comm'y Corr., Inc.*, –F. Supp. 3d–, 2015 WL 9239821, at *6 (M.D. Tenn. Dec. 17, 2015); *Lee v. Orr*, No. 13-cv-8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013). *See generally* Newberg on Class Actions § 4:30 (5th ed. 2015) ("Rule 23(b)(2) authorizes certification of a class solely for the purpose of final injunctive or declaratory relief. Hence, a case seeking only a provisional remedy like a preliminary injunction cannot be certified under Rule 23(b)(2) on that basis alone.").

[141]*See* Charles Wright, Arthur Miller, & Mary Kay Kane, Federal Practice & Procedure § 1785.2 (3d ed.); Newburg § 4:35 ("As of 2012, courts in six circuits have applied some version of necessity analysis," including the Tenth Circuit).

parties in this case point the Court to *Kansas Health Care Association, Inc. v. Kansas Department of Social & Rehabilitative Services*,[142] where the Tenth Circuit recognized the necessity doctrine and upheld the district court's decision that class certification was not necessary in order to award classwide preliminary injunctive relief.[143]  Other cases in this circuit suggest that foregoing class certification under these circumstances is appropriate: (1) where the nature of the rights asserted require that the injunction run to the benefit of all persons similarly situated;[144] and (2) where there is little risk of the named plaintiffs' claims becoming moot during a live controversy.[145]

Under the circumstances of this case, class certification is unnecessary in order to award relief to all Kansas Medicaid patients who obtain or seek to obtain covered health services from PPKM and PPSLR.  The Court has granted the motion for preliminary injunction, enjoining the KDHE from enforcing its termination decisions until this case can be decided on the merits.  This directive will allow all Kansas Medicaid patients who seek to obtain covered services from these providers, to have those services covered.  And there is no suggestion by either party that the Jane Doe Plaintiffs' claims will become moot during the pendency of the lawsuit.  Under these circumstances, Plaintiffs' motion for class certification is denied without prejudice.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 12) is **granted**.  Defendant, her

---

[142] 31 F.3d 1536 (10th Cir. 1994).

[143] *Id.* at 1548; *see also Planned Parenthood S.E., Inc. v. Bentley*, 141 F. Supp. 2d 1207, 1226–27 (M.D. Ala. 2015) (granting preliminary injunction that reinstates provider agreement without ruling on motion for class certification); *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 652 (M.D. La. 2015) (same).

[144] *E.g, Aacen v. San Juan Cnty. Sheriff's Dep't*, 944 F.2d 691, 700 & n.12 (10th Cir. 1991); *Everhart v. Bowen*, 853 F.2d 1532, 1538 n.6 (10th Cir. 1988), *rev'd on other grounds sub nom. Sullivan v. Everhart*, 494 U.S. 83 (1990).

[145] *Jackson v. Ash*, No. 12-CV-2504-EFM, 2014 WL 1230225, at *6–7 (D. Kan. Mar. 25, 2014) (erring on side of class action where claims involved "ever-changing jail or prison population"); *Clay v. Pelle*, No. 10-cv-1840-WYD-BNB, 2011 WL 843920, at 7 (D. Colo. Mar. 8, 2011) (same).

employees, agents, and successors in office are hereby restrained from terminating the Medicaid provider agreements of PPKM and PPSLR;

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss (Doc. 59) is **denied in part and taken under advisement in part;**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Certify Class (Doc. 14) is **denied without prejudice**; and

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike Exhibits (Doc. 51) is **denied**.

**IT IS SO ORDERED.**

Dated: July 5, 2016

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE
